IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHINSHO AMERICAN CORPORATION | § § § § | |
| PLAINTIFF, | § § | |
| | § | CIVIL ACTION NO. 4:20-cv-00577 |
| VS. | § § | JURY DEMANDED |
| HYQUALITY ALLOYS, LLC | § § § | |
| DEFENDANT. | § § | |

**DEFENDANT HYQUALITY ALLOYS, LLC'S ANSWER TO
SHINSHO'S FIRST AMENDED COMPLAINT, AFFIRMATIVE
DEFENSES, AND ORIGINAL COUNTERCLAIMS**

Defendant HyQuality Alloys, LLC ("HyQuality") files this, its Answer to Plaintiff Shinsho American Corporation's ("Shinsho") First Amended Complaint, Affirmative Defenses, and Original Counterclaims, and states as follows:

**I.   ANSWER**

The paragraphs below are responsive to and/or correspond to the equally-numbered paragraphs in Shinsho's First Amended Complaint:

1.   HyQuality lacks information admit or deny the allegations in paragraph 1; to the extent an answer is required, deny.

2.   As to paragraph 2, HyQuality admits it is a Texas limited liability company, but denies its principal place of business is in Montgomery County, Texas. HyQuality's principal place of business is in Illinois.

1

3. HyQuality admits the allegations in paragraph 3.

4. HyQuality admits the allegations in paragraph 4.

5. HyQuality lacks information admit or deny the allegations in paragraph 5. Insofar as an answer is required, deny.

6. HyQuality denies the allegations in paragraph 6.

7. As to paragraph 7, HyQuality denies that it is a landlord insofar as it implies that HyQuality owns the land on which the Tamina Road Property sits. HyQuality further avers that the terms of the Ground Lease speak for itself and/or are questions of law for the Court to determine. Insofar as an answer is required, deny.

8. As to paragraph 8, HyQuality avers that the terms of the Ground Lease speak for itself and/or are questions of law for the Court to determine. Insofar as an answer is required, deny.

9. As to paragraph 9, HyQuality avers that the terms of the Ground Lease speak for itself and/or are questions of law for the Court to determine. HyQuality denies that Shinsho has made all required rental payments, either through cash payments or setoffs.

10. HyQuality denies the allegations in paragraph 10.

11. HyQuality denies the allegations in paragraph 11.

12. HyQuality denies the allegations in paragraph 12.

13. HyQuality admits it denied access to Shinsho on January 30, 2020 to the "Demised Premises" but denies that it was wrongful or without justification. As to the remaining allegations in paragraph 13, deny.

14. HyQuality denies the allegations in paragraph 14.

15. HyQuality denies the allegations in paragraph 15.

16. HyQuality denies the allegations in paragraph 16.

17. HyQuality denies that it engaged in wrongful conduct and HyQuality lacks information admit or deny the remaining allegations in paragraph 17. Insofar as an answer is required, deny.

18. HyQuality denies the allegations in paragraph 18.

19. HyQuality denies the allegations in paragraph 19.

20. HyQuality denies the allegations in paragraph 20.

21. HyQuality denies the allegations in paragraph 21.

22. Paragraph 22 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

23. Paragraph 23 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

24. Paragraph 24 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

25. Paragraph 25 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

26. Paragraph 26 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

27. Paragraph 27 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

28. Paragraph 28 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

29. Paragraph 29 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

30. Paragraph 30 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

31. Paragraph 31 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

32. Paragraph 32 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

33. Paragraph 33 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

34. Paragraph 34 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

35. Paragraph 35 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

36. Paragraph 36 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

37. Paragraph 37 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

38. Paragraph 38 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

39. Paragraph 39 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

40. Paragraph 40 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

41. Paragraph 41 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

42. Paragraph 42 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

43. Paragraph 43 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

44. Paragraph 44 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

45. Paragraph 45 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

46. Paragraph 46 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

47. Paragraph 47 contains legal contentions and conclusions for which HyQuality avers no response is required. Insofar as a response is required, deny.

48. Paragraph 48 does not require a response.

## II. AFFIRMATIVE DEFENSES

49. HyQuality asserts the following affirmative defenses to Shinsho's claims:

   a. Shinsho's failure to mitigate any alleged damages;

   b. Prior material breach of the various purchases orders by which HyQuality purchased the Subject Steel; and

   c. Shinsho has acted in bad faith and has unclean hands. Thus, Shinsho is not entitled to any equitable relief. Shinsho's inequitable conduct includes: making

false representations to HyQuality regarding payment of import tariffs, making false representations regarding obtaining import-tariff relief, breaching the various purchase orders by which HyQuality purchased the Subject Steel, reneging on agreements and promises related to the Kurt Orban Partners, LLC transaction, and breaching its fiduciary duty to HyQuality.

### III. BACKGROUND FACTS

50. Shinsho claims to be a distributor of various steel products. From 2016 until very recently, HyQuality purchased steel products from Shinsho exclusively through the use of purchase orders. As is customary in the steel industry, Shinsho provided terms and extended credit to HyQuality to complete each sale. Initially, HyQuality's credit limit was capped by the amount of credit insurance that Shinsho could obtain through Compagnie Francaise d'Assurance por le Commerce Exterieur ("Coface").

51. When steel sales were brisk, Shinsho implored HyQuality to do away with its institutional lenders and finance all of their inventory directly through Shinsho. HyQuality did so, and relied heavily upon a $10,000,000 line of credit supplied by Shinsho. The $10,000,000 credit facility amount was far above Shinsho's Coface limit. Little did HyQuality know that this would be its undoing as it placed itself at the mercy of Shinsho's control, unpredictable whims, and endless bureaucracy. HyQuality trusted Shinsho and believed it would be a valuable business partner and ally. Unbeknownst to HyQuality, it had let the fox in the henhouse.

52. This lawsuit is Shinsho's last attempt to strong-arm HyQuality into obtaining what it could not through Coface – guaranteed payment despite its own reckless actions. It has also become clear that Shinsho is willing sabotage and destroy HyQuality's business to not only obtain payment, but to usurp HyQuality's customer base.

A. **Transactions Prior To February 2018**

53. Prior to February 2018, all transactions between Shinsho and HyQuality were completed through purchase orders. The material terms of each purchase order contemplated freight on board ("FOB") delivery and cash terms between 30 and 90 days. FOB delivery means that the buyer takes delivery of goods from the seller once the steel arrives at the buyer's receiving dock. Upon arrival, the buyer takes title and possession of the steel and incurs the obligation to pay pursuant to the terms of the purchase order. Until delivery, however, the seller bears all freight charges, all costs associated with it, and has title to the steel.

54. All the purchase orders issued by HyQuality prior to February 2018 contained the following:

> The parties agrees [sic] that this purchase order is governed by the HQA purchase terms & conditions, which are set forth on HQA's website, and are incorporated herein by reference.

HyQuality's Terms and Conditions of Purchase provide the following:

- The purchase order was a binding contract by Shinsho's commencement of performance;

- The terms of the purchase order could not be modified except by written agreement of the parties;

- Shinsho was required to provide HyQuality with the benefit of any price decline or better terms provided to another buyer of the same goods, but could not upwardly adjust the price without HyQuality's consent;

- Shinsho would have title to the steel *until it was delivered*. Specifically, "[p]assing of title upon such delivery shall not constitute acceptance of the items by Buyer";

- Shinsho agreed to indemnify HyQuality, including payment of attorney's fees – even for breach of contract claims such as the one levied by Shinsho;

- Shinsho shall give access to HyQuality to its materials;

7

- Illinois law governs the purchase orders; and

- HyQuality may terminate the purchase order if any governmental entity assessed a tariff on the importation of the subject steel.

55. HyQuality never agreed to amend the terms of the purchase orders. Similarly, HyQuality never agreed to pay tariff costs associated with importing steel orders sold by Shinsho. To HyQuality's surprise, and in violation of the express terms of the POs, Shinsho has shifted the costs of tariffs to HyQuality.

56. HyQuality, through its owner Jason Fowler ("Fowler"), had also approached Shinsho representative Toshinori Taniguchi ("Taniguchi") and requested that Shinsho apply for tariff exemptions for the steel that was being imported. Taniguchi represented to Fowler that Shinsho had sought tariff exemptions for the steel but, when HyQuality requested confirmation, Shinsho refused to provide any documentation supporting the tariff exemption requests. Eventually Shinsho produced tariff exemption denials; however, HyQuality believes that Shinsho did not timely apply for the exemptions and that Shinsho's lack of diligence, whether intentional or not, was the cause of the denial for the tariff exemptions. Shinsho then charged HyQuality for the tariff exemptions in violation of the POs.

**B. The Steel Market Slow Down and the "Consignment Agreement"**

57. In late-summer and fall of 2017, the Texas oil and gas market slowed considerably reducing the need for steel like the one sold by Shinsho. As HyQuality's customers began slow-paying their invoices, HyQuality's inventory and its accounts payable to Shinsho increased. Nevertheless, HyQuality continued to make regular payments to Shinsho but began carrying a balance on its credit line.

58.     Realizing that HyQuality's debt was unsecured and that it did not own title to the steel that had been delivered to HyQuality's facility at 32703 Tamina Road in Magnolia, Texas 77354 (the "Tamina Road Facility"), Shinsho began the process of attempting to strong-arm HyQuality into subsequent agreements to obtain a purchase money security interest ("PMSI") in the steel Shinsho had previously delivered on an unsecured basis. With this goal in mind, Shinsho proposed an agreement entitled "Consignment Agreement" that purported to vest title of the steel delivered to the Tamina Road Facility in Shinsho until "[Shinsho] shall invoice [HyQuality] for any Consigned Goods which have been released from consignment within sixty (60) days of receipt at warehouse or which is held by [HyQuality] at the expiration or earlier of this agreement." The "Consignment Agreement" defined "Consigned Goods" as steel that "[Shinsho] and [HyQuality] mutually desire that [Shinsho] places" certain steel in HyQuality's warehouses, one of which was the Tamina Road Facility.

59.     The "Consignment Agreement" however, does not address whether the steel that had been ordered prior to February 21, 2018 was contemplated by the terms therein. The execution of the "Consignment Agreement" did not change the longstanding practice of making steel purchases through purchases orders with the same terms that have always applied between Shinsho and HyQuality.

60.     In essence, the "Consignment Agreement" did nothing to change the ordinary course of business between Shinsho and HyQuality and amounts to nothing more than parol evidence. Shinsho's counsel, Spencer Marks ("Marks"), admitted as much in an email wherein he stated plainly:

> The Consignment Agreement is merely a contract outline of what was supposed to occur. *Neither side has clean hands in this regard <u>and any enforceable</u>*

9

>     *position is questionable.* This means all transactions unless specifically covered will default to the UCC as between dealers . . .

Shinsho is now taking a position *contrary to the admission of its attorney* that the steel referenced in the purchase orders dated before and after February 21, 2018 created a consignment in favor of Shinsho. It is undeniable that, under the clear terms of the purchase orders issued before and after the execution of the "Consignment Agreement", title transferred to HyQuality upon delivery of the steel to the Tamina Road Facility.

61. All purchase orders placed after February 18, 2020 make no mention of the "Consignment Agreement" nor do they create a consignment in favor of Shinsho; rather, title continued to transfer to HyQuality upon delivery of the steel to the Tamina Road Facility.

C. **The "Internal Glitch" and the Ground Lease Agreement**

62. As the steel market continued to collapse in early 2019, Shinsho became increasingly desperate. Shinsho began using more extreme tactics in an attempt to put HyQuality in default so that it could call its $10,000,000 credit line. For example, Shinsho "neglected" to invoice HyQuality for $5,000,000 *for nearly a year* and then demanded payment in thirty days pursuant to the terms of the "Consignment Agreement." Up to that point, HyQuality had been successfully servicing its debt owed to Shinsho. Nevertheless, Shinsho now threatened to suspend HyQuality's line of credit and choking off its cash flow in a transparent attempt to put HyQuality out of business. When confronted by HyQuality, Shinsho called it an "internal glitch" and continued to demand full payment under the "Consignment Agreement."

63. In subsequent communications between Shinsho's and HyQuality's counsel, Shinsho did not deny that the "Consignment Agreement" did not create a consignment

relationship or that HyQuality's books accurately reflected the position that HyQuality owned the steel delivered pursuant to the purchase orders.

64. Shinsho's desperation grew. Shinsho and HyQuality representatives met several times in a transparent attempt for Shinsho to secure "some claim" to the steel delivered to the Tamina Road Facility. Shinsho proposed that Shinsho lease a portion of the Tamina Road Facility where HyQuality's steel was stored ("Demised Premises"). Apparently, Shinsho believes that by leasing the premises under HyQuality's steel that it could claim that the steel was never delivered pursuant to purchase orders and that the steel had always been in Shinsho's actual or constructive possession.

65. Shinsho drafted a document entitled "Ground Lease Agreement" (the "Lease") and presented it to HyQuality for signature. Therein, Shinsho's counsel identified the "Landlord" as HyQuality despite the fact that a cursory review of the Montgomery County property records would have revealed that the owner of the property was actually Magnolia Storage and Logistics, LLC ("Magnolia"). Shinsho's counsel repeatedly emailed HyQuality's counsel for comment, who replied that he was in a weeks-long trial in Karnes City, Texas and would not be able to review the Ground lease until his return. Nevertheless, Shinsho's counsel pressured HyQuality through its then Chief Operating Officer, Robert Mandel, to execute the lease using Illinois counsel unfamiliar with the entire situation.

66. Shinsho never conducted any business at the Tamina Road Facility and relied upon HyQuality personnel to move, tag, and store the disputed steel. Shinsho was constantly emailing HyQuality requesting that it mark the steel it now claims title. The Lease was nothing but a sham for Shinsho to attempt to secure steel that it had sold to HyQuality on an unsecured basis.

### D.  The Kurt Orban Partners Shakedown

67. In one of the various meetings between Shinsho and HyQuality wherein Shinsho attempted to come up with "some claim" to the steel, Shinsho attempted to coerce HyQuality to pay for an almost $2,900,000 obligation owed by Kurt Orban Partners, LLC ("KOP") to Shinsho. KOP is a steel broker with a decades-long relationship with Shinsho. KOP's founder, Kurt Orban, played an integral part in first introducing Japanese steel goods to the American market and, upon information and belief, is a revered figured among Shinsho circles. When Kurt Orban passed, his son, Matt Orban, took over KOP's business operations and continued working with Shinsho.

68. The relationship between Shinsho and KOP soon soured over a steel-financing transaction that also involved Bar Source International, LLC ("BSI"), a Fowler-owned entity that is no longer operational. The Shinsho-KOP-BSI transaction resulted in an outstanding payable due from KOP to Shinsho of almost $2,900,000. Instead of seeking legal redress against KOP, Shinsho set its sights on HyQuality, a non-party to the Shinsho-KOP-BSI transaction.

69. At the same time, Shinsho had been in negotiations to provide $8,000,000 in cash financing to Sidenor Forgings and Castings, GmbH ("SFC") (of which Fowler is a 33.3% owner). SFC needed $8,000,000 to cover part of the cash purchase price of steel plant and business in Spain and embark on a lucrative steel venture. SFC and Shinsho finalized the deal, with both SFC and Shinsho principals executing contracts for the financing of the $8,000,000. After closing on the deal, however, Shinsho breached the financing deal with SFC *by refusing to provide the $8,000,000 in cash unless HyQuality paid the $2,900,000 obligation owed by KOP to Shinsho*. Under ordinary circumstances it would be unfathomable why Shinsho would attempt to extract a ~$2,900,000 payment from HyQuality for a debt owed to Shinsho by KOP and hold the

12

SFC financing hostage if HyQuality did not pay. However, these are not ordinary circumstances and Shinsho is not an ordinary creditor. Shinsho's wrongful, bold, and brazen shakedown of HyQuality over unrelated debts and unrelated transactions is yet another example of Shinsho's coercive and bad-faith use of its influence over HyQuality to wring out concessions and advantages that Shinsho would not otherwise be able to obtain.

70. Fowler, faced with the imminent collapse of the SFC deal because Shinsho's nefarious actions in refusing to fund the deal unless HyQuality paid KOP's debts to Shinsho, had no choice but to give in to Shinsho's unreasonable demands. HyQuality reluctantly agreed to pay KOP's ~$2,900,000 debt in exchange for Shinsho following through on funding the SFC deal and in exchange for assigning the right to collect the KOP debt to HyQuality. HyQuality, as a down payment on this transaction, wired approximately $250,000 to Shinsho. Shinsho, however, reneged on this agreement and ultimately refused to fund the SFC transaction and now maintains that it never assigned its claim against KOP to HyQuality. Surprisingly, Shinsho retained the ~$250,000 and refuses to return said funds.

### IV. CAUSES OF ACTION

71. The preceding paragraphs are incorporated by reference herein as is fully restated for all purposes.

### Count I - Breach of Contract (Purchase Orders)

72. The purchase orders are valid and enforceable contracts between the parties.

73. HyQuality is a proper party to bring suit for breach of the purchase orders and has performed all of its obligations under same.

74. Shinsho has breached the purchase orders by, among other things, denying that the purchase orders are valid and claiming that the steel identified in each purchase order is

actually owned by Shinsho and by unlawfully charging HyQuality the costs of tariffs that were to be borne by Shinsho.

75. Shinsho's breach of the purchase orders has caused and is continuing to cause damages and injury to HyQuality.

### Count II - Conversion

76. HyQuality owns and possesses the steel that Shinsho claims as its own under the "Consignment Agreement" and "Ground Lease Agreement."

77. The steel constitutes personal property.

78. Shinsho has wrongfully exercised dominion and control over the steel by, among other things, claiming title to the steel, and interfering with HyQuality's unqualified right to sell the steel as it deems fit.

79. HyQuality has suffered and is continuing to suffer damages and injury from Shinsho's wrongful exercise of dominion and control over the steel.

### Count III – Breach of Contract (KOP Assignment)

80. The agreement to purchase Shinsho's claim against KOP is valid and enforceable contracts between the parties.

81. HyQuality is a proper party to bring suit for breach of the assignment agreement.

82. HyQuality has performed all of its obligations under same, including wiring the $250,000 to purchase the claim.

83. Shinsho has breached the assignment agreement by reneging on same and refusing to return the funds to HyQuality.

84. Shinsho's breach has caused HyQuality damages and injury.

### Count IV – Promissory Estoppel (KOP Assignment)

85. Shinsho made a promise to HyQuality that it would assign its claim against KOP for ~2,900,000 if HyQuality paid Shinsho the outstanding amount of the same debt.

86. In reliance of said promise, and as required by Shinsho, HyQuality made a payment of ~$250,000 to Shinsho.

87. Shinsho knew or should have known that HyQuality would reasonably and foreseeably rely on Shinsho's promise and HyQuality did rely on such promise.

88. HyQuality's reliance on Shinsho's promise cause a definite, direct, and substantial injury to HyQuality and resulted in a benefit to Shinsho.

### Count V – Breach of Fiduciary Duty

89. A special relationship existed between Shinsho and HyQuality. Shinsho exercised undue control and influence over HyQuality. Shinsho made a promise to HyQuality that it would assign its claim against KOP for ~2,900,000 if HyQuality paid Shinsho the outstanding amount of the same debt.

90. In reliance of said promise, and as required by Shinsho, HyQuality made a payment of ~$250,000 to Shinsho.

91. Shinsho knew or should have known that HyQuality would reasonably and foreseeably rely on Shinsho's promise and HyQuality did rely on such promise.

92. HyQuality's reliance on Shinsho's promise cause a definite, direct, and substantial injury to HyQuality and resulted in a benefit to Shinsho.

### Count VI –Declaratory Judgment (Consignment Agreement)

93. A dispute and controversy has arisen between the parties regarding the alleged "Consignment Agreement" and the legal rights, if any, created by such. HyQuality therefore seeks a declaration that:

   a. The "Consignment Agreement" does not affect the rights or terms of any purchase order prior to February 21, 2018;

   b. The "Consignment Agreement" does not displace the express terms of each purchase order, whether placed before or after February 21, 2018;

   c. The "Consignment Agreement" is not a true consignment under UCC 9.102(20);

   d. HyQuality acquired title to any steel ordered after February 21, 2018 on the 61st day after the steel was delivered; and

   e. The purchase orders are governed by Illinois law.

### Count VII – Attorney's Fees

94. HyQuality is entitled to recover from Shinsho its reasonable and necessary attorney's fees incurred in pursuing this action under CPR 38 *et seq.*, CPRC 37 *et seq.*, and the terms of the purchase orders.

### V. Jury Demand

95. HyQuality hereby demands a trial by jury.

### VI. Prayer

Defendant HyQuality Alloys, LLC prays that Plaintiff Shinsho American Corporate take nothing from its claims and that HyQuality be awarded the following relief from Shinsho: actual damages, pre-and post-judgment interest, the declarations sought herein, attorney's fees, and for such other relief as HyQuality may justly be entitled to.

Respectfully submitted,

By: /s/ *Rodney Drinnon*
Rodney Drinnon, *Attorney-in-Charge*
Texas Bar No. 24047841
S.D. Tex. I.D. No. 6059446
rdrinnon@mccathernlaw.com
2000 West Loop South, Suite 1850
Houston, Texas 77027
832-533-8689 Telephone
832-213-4842 Facsimile
ATTORNEY FOR PLAINTIFF

*Of Counsel:*
McCathern Houston
Isaac Villarreal
Texas Bar No. 24054553
S.D. Tex. I.D. No. 958226
ivillarreal@mccathernlaw.com
Eric M. Utermohlen
Texas Bar No. 24103974
S.D Tex. I.D. 3072485
eutermohlen@mccathernlaw.com
2000 W. Loop South, Suite 1850
Houston, Texas 77027
Tel. 832.533.8689
Fax 832.213.4842

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the following counsel of record by the Court's electronic filing service on 21st day of April, 2020:

Thomas M. Farrell
Charles B. Hampton
MCGUIREWOODS, LLP
600 Travis Street, Suite 7500
Houston, Texas 77002

/s/ *Rodney Drinnon*
Rodney Drinnon