United States District Court
Southern District of Texas
**ENTERED**
September 25, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Shinsho American Corporation, *Plaintiff,* | § § § | |
| v. | § § | Civil Action H-20-577 |
| HyQuality Alloys, LLC, *Defendant,* | § § § | |
| and | § § | |
| TransPecos Bank, SSB, *Intervenor-Defendant.* | § § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court held a bench trial on February 21–22, 2023.[1] Pursuant to Federal Rule of Civil Procedure 52(a)(1), the court makes these findings of fact and conclusions of law.[2]

### 1. Executive Summary

Because the facts and issues in this case are somewhat convoluted, the court will summarize in this section the basic facts, the contentions of the parties, and the court's ultimate conclusions. The court sets forth its full findings of fact and conclusions of law below in the sections following this one.

---

[1] The parties consented to the jurisdiction of the undersigned magistrate judge for all purposes including entry of final judgment.

[2] For convenience and clarity, the court has stated certain legal conclusions together with certain factual findings. Any finding of fact that might also be construed as a conclusion of law should be so construed. Any conclusion of law that might also be construed as a finding of fact should be so construed.

HyQuality Alloys, LLC, (HQA) uses[3] a warehouse on Tamina Road in Montgomery County, Texas, (Warehouse or Tamina Road Warehouse) to store metal products, such as steel, for sale. One of its steel suppliers was Shinsho American Corporation (Shinsho). Shinsho and HQA transacted business beginning in 2015.

There are two categories of steel at issue in this case: (1) steel that Shinsho shipped to HQA, for which Shinsho invoiced HQA, but for which HQA did not pay; and (2) steel that Shinsho shipped to HQA, for which Shinsho did not invoice HQA and which was present at the Tamina Road Warehouse when this lawsuit was filed in March 2020—the "Subject Bar." As will be discussed, some of the Subject Bar remains to this day at the Warehouse, and some of it has been sold under the Agreed Order Granting Preliminary Injunction, as modified, (Preliminary Injunction). *See* ECF Nos. 21, 75.

The court turns first to the dispute between Shinsho and HQA. Shinsho sued HQA for, among other causes of action, breach of contract. HQA failed to hire counsel and did not participate in the trial of this case. The court struck HQA's answer and counterclaim, allowed for the Clerk to enter default, and deferred entry of default judgment. ECF No. 121. Before the case was assigned by consent to the undersigned magistrate judge, U.S. District Judge Miller entered summary judgment against HQA in favor of Shinsho in the amount of $9,385,865.61 based on HQA's breach of contract. That amount represents what HQA owes

---

[3] HQA used to own the Warehouse, but TransPecos, SSB, (TransPecos) has since foreclosed on it.

Shinsho for steel Shinsho delivered to HQA, for which Shinsho invoiced HQA, and for which HQA did not pay.

Shinsho presented evidence at trial that it incurred other costs as a result of HQA's breach of contract, which the court will award as damages. Moreover, Shinsho has shown that it incurred attorney's fees, costs, and interest, which will also be awarded.

The court summarizes next the dispute between Shinsho and TransPecos Bank, SSB, (TransPecos). TransPecos intervened in this lawsuit as a defendant. The dispute between Shinsho and TransPecos has its roots in two loans that HQA took from TransPecos in 2016. The collateral for both loans included all inventory that HQA then owned within the Tamina Road Warehouse, as well as any inventory it might thereafter acquire at the Warehouse. Near the time that the loans were made, TransPecos filed a UCC-1 statement perfecting its security interest in the collateral, including the inventory owned or after acquired.

Shinsho shipped steel, including the Subject Bar, to HQA after HQA took out the loans. The dispute in this case relates to ownership of the Subject Bar and whether the Subject Bar is part of the collateral securing the loans. TransPecos seeks two forms of relief: (1) it seeks a declaration that it holds a security interest in the Subject Bar that is superior to Shinsho's; and (2) damages from Shinsho for conversion of proceeds from the sale of some of the Subject Bar pursuant to the Preliminary Injunction. The court concludes that TransPecos has the superior security interest but that Shinsho is not liable for conversion.

Until 2018, HQA was a profitable company with a positive cash flow. Its business arrangement with Shinsho was typical. HQA would issue a purchase order to Shinsho with thirty-day payment terms, meaning that Shinsho would issue an invoice giving HQA thirty days to pay. The steel ordered on the purchase order was "F.O.B. [freight on board] Delivered," meaning that title to and risk of loss for the steel would remain with Shinsho until the steel was delivered to HQA. Title to and risk of loss for the steel would shift to HQA upon delivery. Accordingly, any steel delivered to HQA under the described arrangement would become HQA's property upon delivery and thus part of the inventory constituting the collateral for the two loans.

In 2018, HQA began having financial difficulties. The oil and gas industry experienced a downturn, and the imposition of tariffs on steel increased steel prices. As a result, HQA's customers began refusing their steel deliveries. HQA in turn was unable to pay Shinsho's invoices. To solve the problem, HQA and Shinsho agreed to alter their payment terms from net thirty days to extended terms. The purported vehicle to effectuate the change in payment terms is a contract that is central to this dispute—the February 21, 2018 Consignment Agreement.

By its terms, the Consignment Agreement is what one would expect it to be. The parties could elect to have Shinsho ship steel to HQA on consignment. That is, HQA would order steel, and the steel would be delivered to the Tamina Road Warehouse, but title to the steel would remain with Shinsho until such time as it was sold to a third party, if ever. Shinsho's position in this case is that

4

the Subject Bar was ordered, shipped, and received under the terms of the Consignment Agreement. According to Shinsho, the Subject Bar belongs to Shinsho, not HQA, and is not part of TransPecos's collateral.

TransPecos argues that the Subject Bar was not purchased on consignment and is thus part of HQA's after-acquired inventory and is thus TransPecos's collateral. TransPecos further argues that, to the extent that any of the Subject Bar was shipped and received under the terms of the Consignment Agreement, although it would not be owned by HQA, it is nevertheless part of TransPecos's collateral. That is because, under the UCC, goods held on consignment become part of the consignee's inventory and thus part of its bank's collateral if the consignee is not in the business of and known for dealing in consigned goods.

The court need not reach the question of whether TransPecos had actual or constructive notice that HQA was dealing in consigned goods. The court finds that none of the Subject Bar was ordered, shipped, or received under the terms of the Consignment Agreement. Shinsho and HQA did not avail themselves of the Consignment Agreement. Rather, all the Subject Bar was ordered under the purchase orders that had been in place since 2015. Shinsho delivered the Subject Bar F.O.B. Delivered under the purchase orders, and title to it passed to HQA upon delivery. As a result, the Subject Bar became after-acquired inventory in which TransPecos had a security interest perfected by a UCC-1 that is superior to any security interest Shinsho may have had.

The second part of the dispute between Shinsho and TransPecos is TransPecos's counterclaim for conversion. TransPecos's position is that Shinsho received proceeds from unauthorized sales of the Subject Bar, thus converting those proceeds in which TransPecos has the superior interest. The TransPecos loan documents did not require HQA to pay sales proceeds directly to TransPecos. TransPecos and HQA specifically avoided that result when negotiating the terms of the loans. While HQA was liable for its payments on the loans, there is no evidence that HQA was required to pay the loans down directly from its sales proceeds. To the contrary, the evidence shows that TransPecos agreed to HQA's use of the proceeds on the continued operation of the business. The court finds that TransPecos authorized the sale of the Subject Bar. TransPecos will therefore take nothing on its conversion claim.

## 2. Background and Procedural Posture

Shinsho sued HQA in Texas state court. ECF No. 1-1. Shinsho alleged that it was a distributor of steel products, some of which—the Subject Bar—was being stored at the Tamina Road Warehouse. ECF No. 1-1 at 3. Shinsho was renting a portion of the Warehouse from HQA at a rate of $25,000 per month to store steel. ECF No. 1-1 2.

Shinsho alleged that HQA was not the owner or title holder of the Subject Bar. ECF No. 1-1 at 3. Shinsho sought to enter the Tamina Road Warehouse to audit and remove the Subject Bar, but HQA denied Shinsho access to the Warehouse. ECF No. 1-1 at 3–4. According to the state court petition, HQA claimed to own the

Subject Bar. ECF No. 1-1 at 4. Shinsho also alleged that HQA was wrongfully removing the Subject Bar from the Warehouse. ECF No. 1-1 at 4. Shinsho brought causes of action against HQA for breach of the Warehouse lease, unlawful lockout, and conversion. ECF No. 1-1 at 5–7. Shinsho sought damages, a writ of possession or reentry, a writ of sequestration, a temporary restraining order, and preliminary and permanent injunctive relief. ECF No. 1-1 at 6–8. HQA removed the case to federal court on February 19, 2020. ECF No. 1.

On March 3, 2020, Judge Miller, to whom the case was then assigned, entered the Agreed Order Granting Preliminary Injunction. ECF No. 21. In relevant part, the Order prevented HQA from interfering with, moving, or removing the Subject Bar. ECF No. 21 at 2–3. The order also prevented HQA from selling the Subject Bar except under the specific conditions set forth in the order. ECF No. 21.

On April 20, 2021, Judge Miller granted TransPecos's motion to intervene in the case as a defendant. ECF No. 53. In TransPecos's Answer to Shinsho's First Amended Complaint, TransPecos alleged that HQA was the owner of the Subject Bar and that TransPecos had a security interest in the Subject Bar. ECF No. 59 at 2. TransPecos also filed a counterclaim against Shinsho for conversion and for a declaratory judgment that TransPecos's lien on the Subject Bar is superior to any interest that Shinsho holds and constitutes TransPecos's collateral. ECF No. 78. TransPecos joined HQA on the latter to ensure that it also would be bound by the court's decision. *See* ECF No. 78 at 4.

TransPecos alleged that HQA was an obligor to TransPecos on two promissory notes. ECF No. 78 at 2. TransPecos alleged that the notes were secured by deeds of trust and security agreements with liens perfected by filing of, among other things, UCC-1 statements. ECF No. 78 at 2. According to TransPecos, the collateral securing the repayment of both notes consisted of HQA's assets including its inventory and any proceeds from the sale of the inventory. ECF No. 78 at 2. TransPecos claimed that HQA was the outright owner of the Subject Bar, which was therefore part of the collateral securing the notes. ECF No. 78 at 3. Alternatively, TransPecos claimed that, to the extent the Subject Bar was held by HQA on consignment for Shinsho, Shinsho had not perfected its security interest in the Subject Bar, so TransPecos's security interest was superior to Shinsho's interest. ECF No. 78 at 3. TransPecos brought a cause of action against Shinsho for conversion of the proceeds it had received from HQA's sale of the Subject Bar under the Preliminary Injunction. ECF No. 78 at 3. TransPecos also sought a declaratory judgment that its lien on the Subject Bar and proceeds is superior to any interest of Shinsho and that the Subject Bar is TransPecos's collateral. ECF No. 78 at 3–4.

On June 23, 2021, after briefing and complaints by Shinsho that HQA was not in compliance with the Preliminary Injunction, Judge Miller entered an Agreed Order Modifying Preliminary Injunction. ECF No. 75. Among other things, the Order allowed Shinsho to place a staff member at the Tamina Road Warehouse to monitor and authorize shipments of the Subject Bar. ECF No. 75 at 1.

On July 30, 2021, Shinsho filed its Second Amended Complaint against HQA. ECF No. 80. HQA answered. ECF No. 85. On January 25, 2022, Judge Miller issued a memorandum and opinion granting summary judgment against HQA in favor of Shinsho in the amount of $9,385,865.61. *See* ECF No. 94. On August 25, 2022, HQA's counsel moved to withdraw, ECF No. 106, which U.S. District Judge Hughes, who had by then been assigned this case, granted, ECF No. 107. The Order on Withdrawal required HQA to hire new counsel. ECF No. 107. HQA failed to hire counsel, so Shinsho filed a motion to strike HQA's answer and counterclaim, ECF No. 110, which the court granted, ECF No. 121. The court also permitted the Clerk to enter default (which apparently never occurred) but deferred the question of whether to enter default judgment. ECF No. 121 at 7.

Upon consent of the parties, ECF Nos. 125, 126, 130, the case was transferred to the undersigned magistrate judge on December 9, 2022, for all purposes including entry of final judgment. ECF No. 130. The court conducted a bench trial on February 21 and 22, 2023.

### 3. Findings of Fact[4]

#### a. Facts Relevant to Shinsho's Claims Against HQA[5]

As mentioned, HQA failed to hire counsel, and the court struck its answer and counterclaim. HQA did not participate in the trial and has presented no defense. Accordingly, the facts presented against it are undisputed.

Shinsho is a trading company that imports into the United States products such as steel. Shinsho acquires steel from the mill and delivers it to customers in the United States like HQA. ECF No. 138 at 24. Shinsho K'mac Precision Parts (SKPP) is a company affiliated with Shinsho. ECF No. 138 at 25. In 2017 and 2018 both Shinsho and SKPP sold significant amounts of steel to HQA. ECF No. 138 at 25. HQA failed to pay for much of that steel. SKPP assigned Shinsho its right to collect from HQA on invoices that SKPP had sent to HQA.

The amount that Judge Miller awarded Shinsho on summary judgment, $9,385,865.61, represents steel Shinsho sold to HQA during 2017 and 2018, for which SKPP and Shinsho invoiced HQA, but for which HQA did not pay. ECF No. 138 at 26.

---

[4] The court has provided some record cites for the reader's convenience. The citations provided here are not intended to be an exhaustive list of the parts of the record supporting the court's findings of fact. Moreover, the court has not in every instance cited or discussed testimony or exhibits that might contradict those found here. The court presents here the facts that it finds to have been proven by a preponderance of the credible evidence in light of the record as a whole.

[5] For convenience and readability, the court has attempted to segregate the facts relating mostly to claims between Shinsho and HQA from those relating mostly to the claims between Shinsho and TransPecos. Naturally, there is some overlap, and the court seeks to avoid unnecessary repetition. Thus, facts discussed in one section should not be read as pertaining only to that section.

The attorney's fees that Shinsho incurred in pursuit of its claim against HQA were undisputed. ECF No. 138 at 36; *see also* PX[6] 132. The fees have been segregated and do not include those fees incurred in litigating against TransPecos. ECF No. 138 at 36. Shinsho has incurred $454,640 in attorney's fees and $13,028 in costs in prosecuting its claims against HQA. PX 132.

Shinsho filed suit because it believed that HQA was co-mingling Shinsho's inventory with other inventory and selling Shinsho's inventory without paying for it. ECF No. 138 at 30. Among other efforts to curb violations of the Preliminary Injunction, Shinsho hired a security firm to monitor activities at the Tamina Road Warehouse. ECF No. 138 at 30; *see also* ECF Nos. 25, 31, 41, 45, 47, and 61. The security company monitored when steel left the premises at Tamina Road and determined whether it was Shinsho's steel. ECF No. 138 at 31. The security firm was hired shortly after the lawsuit was filed and continued until the date of trial. ECF No. 138 at 30. Shinsho also placed an employee at the Tamina Road Warehouse to oversee shipments of the Subject Bar. *See* ECF No. 138 at 34.

The court concludes that hiring the private security firm and the employee was made necessary by HQA's breaches of its agreements with Shinsho as well as by HQA's violations of the court's Preliminary Injunction. Shinsho paid the security firm a total of $487,426.22. PX 130; *see also* ECF No. 138 at 34. Shinsho incurred $102,011 to place an employee at the Tamina Road

---

[6] PX refers to Shinsho's exhibits.

facility through the time of trial. PX 131; *see also* ECF No. 138 at 34.

### b. *Facts Relevant to the Disputes Between Shinsho and TransPecos*

The Subject Bar, which is entirely separate from the steel addressed in Judge Miller's order on summary judgment, is the steel that was in existence at the Tamina Road Warehouse as of March 2020 when Shinsho filed the state court lawsuit against HQA. *See* PX 59; ECF No. 94; ECF 138 at 28, 40. Shinsho delivered the Subject Bar to HQA but did not invoice HQA for it. ECF No. 138 at 28, 40. Shinsho's book value of the Subject Bar is $21,083,938. ECF No. 138 at 28; PX 59. HQA sold significant amounts of the Subject Bar pursuant to the Preliminary Injunction. Through loans obtained from Crestmark Bank, discussed below, HQA paid Shinsho from sales of the Subject Bar but has not paid down its two loans with TransPecos from any of those funds.

Jason Fowler runs JWF Group, which is a management and consulting company for the steel industry. ECF No. 138 at 118. HQA is one of Fowler's companies, which he started in 2015. ECF No. 138 at 120. Fowler also managed Bar Source, which is a metals distribution company. ECF No. 138 at 120. In 2015, he acquired the asset purchase agreement of another company called Stemcor. ECF No. 138 at 121. Stemcor operated at the Tamina Road Warehouse before HQA. At the time of trial, HQA was operating out of the Tamina Road Warehouse.

Before 2018, HQA was profitable with a positive cash flow. ECF No. 138 at 125. Part of HQA's business involved the purchase

of steel from Shinsho. In 2018, due to a downturn in the oil and gas industry and the imposition of tariffs on steel, HQA began to have financial difficulties. ECF No. 138 at 125.

In 2016, HQA sought financing through TransPecos. Taylor Gamble, director of commercial loan operations for TransPecos since 2019, testified that TransPecos loaned HQA and Magnolia Storage and Logistics, as co-borrowers, $750,000 (Smaller Loan) and loaned HQA $3,829,000 (Larger Loan). ECF No. 138 at 43–45; TPX[7] 5; TPX 6. The Smaller Loan was not guaranteed by the U.S. Small Business Administration (SBA). ECF No. 138 at 45. The Larger Loan was an SBA loan. *See* ECF No. 138 at 45; TPX 7.

Before the loans were approved, TransPecos performed a business valuation of HQA. ECF No. 138 at 64. The high amount of loans required approval of TransPecos's board of directors. ECF No. 138 at 65, 72; *see also* TPX 20. The board of directors ultimately approved the loans. ECF No. 138 at 65. The approval was based on the business valuation. ECF No. 138 at 65.

The understanding of all parties at the time the loans were approved was that HQA would be selling its inventory. ECF No. 138 at 66. That was how HQA would be generating income to pay the loans down. ECF No. 138 at 66. TransPecos did not require HQA to use the inventory sales proceeds to pay down the loans. ECF No. 138 at 67–68. In fact, TransPecos specifically did not want that arrangement because such a requirement would violate SBA rules on long-term loans. ECF No. 138 at 68, 73; TPX 20 at 27. Moreover, if HQA were required to pay down the loan from

---

[7] TPX refers to TransPecos's exhibits.

proceeds of sale of inventory, HQA would lack cash flow to purchase more inventory. The bank accounted for that accommodation while protecting its own financial interests by requiring HQA to maintain a minimum inventory. ECF No. 138 at 73.

The deed of trust for the Tamina Road real property states that the collateral for the loan includes inventory owned by HQA or thereafter acquired by HQA and all proceeds from the sale of the collateral. ECF No. 138 at 46–47; TPX 9 at 2, subsection 1.02(b), (f). TransPecos filed a UCC statement with the Texas Secretary of State to perfect its security interest in the property designated as collateral. ECF No. 138 at 51; TPX 49. The UCC filing statement was filed on September 9, 2016. ECF No. 138 at 51. The filing statement includes HQA's inventory. ECF No. 138 at 51. A UCC continuation was filed on July 1, 2021. TPX 49 at 4. TransPecos properly perfected its security interest in HQA's inventory. There is no evidence that Shinsho made any filings to perfect any security interest it may have had in any of the steel in the Warehouse.

A couple of years after TransPecos approved the two loans, HQA obtained a credit facility with Crestmark Bank. ECF No. 138 at 69. TransPecos assisted HQA in obtaining the financing through Crestmark Bank. ECF No. 138 at 69. The arrangement was in TransPecos's best interest because it freed up cash flow for HQA to purchase more inventory. ECF No. 138 at 69–70. To facilitate the Crestmark Bank credit facility, TransPecos subordinated its security interest in the collateral to Crestmark Bank. ECF No. 138

at 71, 238; *see also* ECF No. 138 at 238. TransPecos's security interest, as of June 22, 2018, when the subordination agreement was put in place, was behind Crestmark Bank in priority as to the proceeds from sales of steel, including the Subject Bar. ECF No. 138 at 71.

HQA was in default on its loan payments to TransPecos as of May 2020. ECF No. 138 at 53. TransPecos sent HQA a letter of default and accelerated maturity of both notes. ECF No. 138 at 53. TransPecos foreclosed on its lien on the Tamina Road real property. ECF No. 138 at 53–54; TPX 51. The bank bid on the property for $1.6 million and was the winning bidder. ECF No. 138 at 54. The substitute trustee deed was filed on May 9, 2022. ECF No. 138 at 55. That was the date of foreclosure. ECF No. 138 at 55.

With credit for the bid at the foreclosure sale, the outstanding debt HQA owed to TransPecos on the day of trial was $3,236,919.11 on the Larger/SBA Loan and $964,206.07 on the Smaller/non-SBA Loan. ECF No. 138 at 55, 61; *see also* TPX 57 (summarizing outstanding balances). The credit was applied pro rata to the principal of both notes. The amounts include principal and default interest as well as collateral preservation expenses. ECF No. 138 at 56.

In 2018, HQA sought to renegotiate payment terms with Shinsho because HQA could not pay Shinsho's invoices on time. According to Fowler, the renegotiation of those terms is embodied in the February 21, 2018 Consignment Agreement. ECF No. 138 at 121; *see also* TPX 2. According to Fowler, the arrangement with

Shinsho moved from 30-day payment terms to 60-day payment terms and then to "extended terms." ECF No. 138 at 25.

Fowler testified that Shinsho and HQA needed the Consignment Agreement so they could operate in the prevailing financial and economic conditions, which included customers refusing to take delivery of their steel orders from HQA. ECF No. 138 at 127. Fowler believed Shinsho needed the Consignment Agreement so it could remain in compliance with other agreements Shinsho had with third parties, including its banks. ECF No. 138 at 127.

The Consignment Agreement was entered into on February 21, 2018, between Shinsho and HQA. TPX 2 at 1. The agreement states the parties desire to place certain materials, referred to as the "Consigned Goods," owned by Shinsho, in one of HQA's three warehouses, including the Tamina Road Warehouse. TPX 2 at 1.

In a paragraph titled "Consignment of Goods," the Consignment Agreement states that, subject to later agreement among the parties as to prices and other necessary terms, *"from time to time* [Shinsho] *may* ship Consigned Goods to HQA's warehouses." TPX 2 at 1, ¶ 2 (emphasis added). The agreement does *not* say that all future shipments will be pursuant to the agreement. In fact, the same paragraph clarifies that:

> HQA will have no obligation to accept for consignment any minimum or maximum quantity of Consigned Goods from SAC pursuant to this Agreement, and SAC will have no obligation to furnish or sell any minimum or maximum quantity of Consigned Goods to HQA pursuant to this Agreement if price, terms and conditions are not agreed upon, except as pursuant to paragraph 5 of this Agreement, [which deals with release of goods from consignment].

16

TPX 2 at 1, ¶ 2. The Consignment Agreement thus contemplates that *no* goods would ship under its terms.

The Consignment Agreement does not purport to govern the entirety of the business relationship between the parties but only governs how goods shipped on consignment will be handled. TPX 2 at 3, ¶ 12 (reciting entire agreement clause). The agreement is effective on the date it was executed and does not purport to have a retroactive effect on any goods ordered before it was executed. TPX 2 at 3, ¶ 9 (reciting effective period clause). The Consignment Agreement does not preclude the parties from operating in the same manner as they did before it was signed.

Before the Consignment Agreement was executed, HQA would issue a purchase order to Shinsho, and Shinsho would ship the steel to HQA. *See* ECF No. 138 at 123; TPX 52. A pre-Consignment Agreement purchase order dated May 18, 2017, which contains terms consistent with all the purchase orders that HQA sent to Shinsho, states various terms, including "F.O.B. Delivered." ECF No. 138 at 207; *see also* TPX 52. The court concludes that "F.O.B." means "freight on board". ECF No. 138 at 207. The court also concludes that "F.O.B Delivered" means title to the goods transfers from Shinsho to HQA when the product is physically delivered to HQA. ECF No. 138 at 207. The latter conclusion is bolstered by the fact that the purchase order was governed by the HQA purchase terms and conditions which are set forth on HQA's website. *See* ECF No. 138 at 207–08; TPX 52 at 3. Those terms and conditions are explicitly incorporated by reference into the purchase order. *See* ECF No. 138 at 207–08;

TPX 54. Paragraph 9 of the terms and conditions is consistent with the meaning the court has ascribed to "F.O.B. Delivered" in that risk of loss and title remains with the seller until delivery. ECF No. 138 at 208.

A post-Consignment Agreement purchase order dated March 1, 2018, uses the same form as and contains the same material terms as all of the purchase orders that HQA sent to Shinsho, both before and after the Consignment Agreement was executed. *See* ECF No. 138 at 209; TPX 53. Specifically, all the purchase orders incorporate by reference HQA's terms and conditions and all state "F.O.B. Delivered." ECF No. 138 at 210. To be clear, all the purchase orders in evidence, whether dated before or after the Consignment Agreement are on the same form and are identical with respect to their incorporation by reference of HQA's terms and conditions and their statement of F.O.B. Delivered. None of the post-Consignment Agreement Purchase Orders refers to the Consignment Agreement, and none of them state that the goods are being ordered on consignment. Fowler testified that the parties did not intend that the steel would be on a "true consignment." ECF No. 138 at 130–31. Fowler also testified that, after the Consignment Agreement was executed, the business operations between Shinsho and HQA continued essentially unchanged. ECF No. 138 at 128.The court credits that portion of Fowler's testimony.

The court concludes that all of the Subject Bar was ordered, shipped, and delivered under the same terms as were in place before the Consignment Agreement was executed. All of the steel

was ordered and shipped F.O.B. Delivered and under the terms and conditions set forth on HQA's website. Title to the Subject Bar thus transferred to HQA when it was delivered to HQA. That is true whether or not Shinsho invoiced HQA for the steel. While the Consignment Agreement permitted Shinsho to ship goods to HQA on consignment, the parties never took advantage of that option and instead continued to ship and receive goods after the Consignment Agreement was executed on the same terms as before it was executed.

The parties' later activities, such as tagging the Subject Bar as belonging to Shinsho, segregating it from other steel within the Warehouse, not reflecting the steel as inventory on HQA's books, or paying property taxes on the steel, did not retroactively change the terms under which it was ordered, shipped, or received. It also does not matter whether the steel had arrived at the Warehouse before or after the Consignment Agreement was executed because the steel was ordered, shipped, and delivered under the same Purchase Orders and procedures that had been used all along. All of these reflect attempts, for whatever reason, to retroactively shift title to the steel back to Shinsho. But these later activities cannot operate to remove the steel from being included in HQA's after-acquired inventory and thus TransPecos's collateral.

### 4. Conclusions of Law

Because the parties are of diverse citizenship and the amount in controversy is greater than $75,000, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

19

HQA failed to hire counsel, and the court struck its answer and counterclaim. ECF No. 121. HQA did not participate in the trial of this case and has otherwise failed to defend itself. Accordingly, entry of default is appropriate under Federal Rule of Civil Procedure 55(a).

Shinsho seeks entry of default judgment against HQA. A motion for default judgment requires the court to determine: (1) if a default judgment is procedurally appropriate; (2) if the plaintiff has presented a colorable claim; and (3) how to calculate damages or equitable relief. *Vela v. M&G USA Corp.*, 2:17-cv-13, 2020 WL 421188, at *1 (S.D. Tex. Jan. 27, 2020). The court must consider relevant factors including:

> whether material issues of fact are at issue, whether there has been substantial prejudice, whether the grounds for default are clearly established, whether the default was caused by a good faith mistake or excusable neglect, the harshness of a default judgment, and whether the court would think itself obliged to set aside the default on the defendant's motion.

*Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

HQA failed to hire counsel after being admonished to do so. HQA failed to participate in the trial of this case despite knowing full well that it was taking place, as was evidenced by Fowler's appearance to testify at the trial. HQA's answer and counterclaims have been struck and all the facts presented against HQA are undisputed. Entry of default judgment is procedurally appropriate. Judge Miller has already granted summary judgment in Shinsho's favor. Moreover, the court concludes that Shinsho is entitled to the amounts paid to its employee and the security firm,

which were necessitated by HQA's breach of its contracts with Shinsho as well as its violations of the court's orders.

Shinsho is awarded $9,385,865.61 in damages. ECF No. 94. Pursuant to Texas Finance Code § 302.002, Shinsho is entitled to six percent interest on that amount, which equals $1,897,742 through May 15, 2023, plus $1,542 per day through the date of final judgment. Shinsho is further awarded $589,437.22 in damages to compensate Shinsho for its expenses incurred in enforcing its agreements with HQA and the court's orders.

Texas Civil Practice and Remedies Code §38.001(8) allows Shinsho to recover its attorney's fees from HQA incurred in Shinsho's pursuit of its breach of contract claim against HQA. Determination of a reasonable attorney's fee requires the court to "first calculate[] the 'lodestar' by multiplying the reasonable number of hours spent on the case by the reasonable hourly rate." *Sheffield v. Stewart Builders, Inc.*, Civil Action H-19-1030, 2021 WL 951897, at *2 (S.D. Tex. Mar. 10, 2021). In the second step, the court considers the *Johnson*[8] factors to determine whether the lodestar should be adjusted. *Id.* The party seeking attorneys' fees bears the burden to prove the reasonableness of the hours spent, the hourly rate, and that billing judgment was exercised. *Pathan v. Basit Enters., Inc.*, Civil Action No. H-09-1506, 2011 WL 13244519, at *3 (S.D. Tex. Jan. 18, 2011).

To determine the reasonable hourly rate, courts must "consider the attorney's regular rates as well as the rate 'prevailing in the community for similar services by lawyers of reasonably

---

[8] *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

comparable skill, experience, and reputation.'" *Pathan*, 2011 WL 13244519, at *4 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). Evidence of the reasonableness of the requested rate must include the attorney's own affidavit as well as "information about rates actually billed and paid in similar lawsuits." *Id.* However, an attorney's unopposed requested hourly rate is generally assumed to be *prima facie* reasonable *Cf. Shaw v. Ciox Health LLC*, Civil Action No. 19-14778, 2021 WL 928032 at *2 (E.D. La. Mar. 11, 2021).

The court must then determine the number of hours reasonably expended on the case. The court must review the timesheets submitted by counsel and exclude those hours that are excessive, duplicative, or not adequately documented. *Pathan*, 2011 WL 13244519 at *5.

Plaintiffs' counsel have justified their hourly rates but have not provided the court with any documentation of their billings. The court thus cannot determine whether the time spent on the case is reasonable. While the court understands that the fee award is unopposed, the court must nevertheless engage in the appropriate analysis to determine a reasonable attorney's fee award. The court will permit Plaintiff's counsel to resubmit their fee application after entry of final judgment as is allowed under Rule 58(e). The court will also consider the issue of costs after entry of final judgment. Shinsho may be awarded only those costs that are listed in 28 U.S.C. § 1920 or other costs for which statute or contract provide.

HQA ordered all of the Subject Bar under purchase orders that stated, "F.O.B. Delivered" and were governed by HQA's terms and conditions as recited on its website. The court finds that title to the Subject Bar vested in HQA when it was delivered to the Tamina Road Warehouse. All of the Subject Bar was present at the Tamina Road Warehouse when this suit was filed. HQA owns all of the Subject Bar.

HQA and Shinsho did not order or ship any of the Subject Bar pursuant to the Consignment Agreement. HQA's and Shinsho's actions after ordering and shipping the Subject Bar, such as tagging it as Shinsho's property or not reflecting it as HQA's inventory, does not alter the court's conclusion.

HQA's loan agreements with TransPecos granted TransPecos a security interest in all of HQA's inventory. The Subject Bar is part of HQA's inventory and is part of TransPecos's collateral. TransPecos filed a UCC-1 statement and perfected its security interest in the Subject Bar.

There is no evidence that Shinsho has any security interest in inventory owned by HQA. Shinsho did not file any UCC-1 statements. Thus, TransPecos's security interest in the Subject Bar is superior to any that Shinsho may have.

To succeed on its conversion claim against Shinsho, TransPecos must prove that Shinsho exercised dominion and control over the Subject Bar in denial of or inconsistent with TransPecos's rights. *See Johnson v. Kaufman Cnty., Tex.*, Civil Action No. 3:15-CV-3595-L, 2017 WL 978099, *6 (N.D. Tex. 2017) (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210

n.44 (Tex. 2002)) "A secured party may bring an action for conversion in order to repossess collateral from a transferee." *United States v. Boardwalk Motor Sports, Ltd.*, No. 4:08-cv-110, 2009 WL 4727911, at *2 (E.D. Tex. Dec. 3, 2009). The general rule is that a security interest continues in collateral notwithstanding sale or other disposition of the collateral and attaches to any identifiable proceeds of collateral. Tex. Bus. & Com. Code § 9.315(a). Under the general rule, the secured party may maintain an action for conversion in the appropriate case. Tex. Bus. & Com. Code § 9.315(a), cmt. 2.

If, however, the secured party authorized, in the security agreement or otherwise, the disposition of collateral free of the security interest, the secured party's security interest does not continue in the collateral. Tex. Bus. & Com. Code § 9.315(a)(1), cmt. 2; *cf. Boardwalk Motor Sports, Ltd.*, 2009 WL 4727911, at *2 (concluding that, under Texas Business & Commerce Code § 9.315(a), the transfer of the sales proceeds to a junior interest creditor "did not extinguish the tax lien unless the [Internal Revenue Service (IRS)] authorized the transfer free of the tax lien"). The question whether the secured party did in fact authorize the disposition of collateral is a fact issue. *See Boardwalk Motor Sports, Ltd.*, 2009 WL 4727911, at *2 (denying summary judgment based on conflicting testimony on whether the IRS authorized the transfer raised a factual dispute).

As discussed above, HQA and TransPecos understood from the start that HQA would sell the Subject Bar on an ongoing basis, using the proceeds to purchase more inventory. TransPecos

wanted that arrangement to avoid running afoul of SBA rules and to keep HQA in business. To protect the value of the collateral, instead of requiring HQA to pay down its loans with proceeds from the sale of the collateral, TransPecos required that HQA maintain a minimum inventory. To further these goals, TransPecos subordinated its security interest in the collateral to Crestmark. Thus, the facts of this case show that TransPecos authorized HQA to sell the collateral free of TransPecos's security interest.

The only case that TransPecos cites in support of its conversion claim is one in which the facts clearly showed that the debtor was not authorized to dispose of the collateral as it did. *See HHH Farms, L.L.C. v. Fannin Bank*, 648 S.W.3d 387, 396–98, 432 (2022) (finding that the loan documents explicitly prohibited the debtor from disposing of the collateral without the lender's consent and required that the debtor pay down the loan with proceeds of the sale).

Because TransPecos authorized the sale of the Subject Bar, Shinsho did not wrongfully accept the proceeds of those sales in denial of TransPecos's rights. TransPecos will take nothing on its conversion claim.

### 5. Conclusion and Order

Any conclusion of law that should be treated as a finding of fact is hereby adopted as that, and any finding of fact that should be treated as a conclusion of law is hereby adopted as that.

Based on the evidence presented at trial, Shinsho is awarded $9,975,302.83 in damages against HQA. Shinsho is further awarded $2,102,828 in pre-judgment interest on those damages against HQA. That amount is equal to $1,897,742 through May 15, 2023, plus $1,542 per day for 133 days after May 15, 2023, through the date of final judgment. The court will award attorneys fees and costs separately as discussed herein.

TransPecos's security interest in the Subject Bar is superior to any security interest Shinsho may have in the Subject Bar.

The Subject Bar is TransPecos's collateral.

TransPecos takes nothing on its conversion claim against Shinsho.

The court will enter a separate Final Judgment.

Signed at Houston, Texas, on September 25, 2023.

_____
Peter Bray
United States Magistrate Judge